UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS

```
                              )
NATIONAL ASSOCIATION OF       )
GOVERNMENT EMPLOYEES, INC.,   )
                              )
     Plaintiff-Respondent,    )
                              ) CIVIL NO. 13-10854-PBS
          v.                  )
                              )
NATIONAL EMERGENCY MEDICAL    )
SERVICES ASSOCIATION, INC.,   )
                              )
and                           )
                              )
TORREN K. COLCORD,            )
                              )
     Defendants-Petitioners.  )
                              )
```

## MEMORANDUM AND ORDER

February 4, 2015

Saris, Chief Judge.

### I. INTRODUCTION

The plaintiff, National Association of Government Employees (NAGE), requests a judgment confirming an arbitration award handed down on May 15, 2014, and requiring the defendants, National Emergency Medical Services Association (NEMSA), to pay NAGE $260,064. NEMSA, in its opposition, asks the Court to vacate the arbitration award. After hearing, NAGE's motion to confirm (Docket No. 91) is **ALLOWED**. NEMSA's motion to vacate (Docket No. 97) and NAGE's motion for attorneys' fees (Docket No. 100) are **DENIED**.

1

## II. FACTUAL BACKGROUND

The plaintiff, NAGE, is a labor organization representing federal, state, and municipal employees. This case involves the International Association of EMTs and Paramedics (IAEP), a subdivision of NAGE with approximately 10,000 members. The defendant, NEMSA, is a smaller organization that represents approximately 5,000 emergency medical services employees. Torren Colcord, also a defendant, is NEMSA's executive director.

In March, 2012, NAGE and NEMSA agreed to join forces, and signed three contracts that eventually gave rise to the arbitration at issue. The Affiliation Agreement required NEMSA monthly to remit funds to NAGE, amounting to 10% of NEMSA's dues and fees from each bargaining unit, and required NAGE to protect NEMSA's bargaining relationships against challenges from other unions (including NAGE). The Servicing Agreement required NEMSA to pay a monthly fee amounting to 85% of the same dues and fees, in return for which NAGE would provide staff and resources to represent NEMSA's unit members. The Employment Agreement, between NAGE and Colcord only, made Colcord a NAGE employee for ten years. The Affiliation and Servicing Agreements both provided that arbitration or mediation were the "only means" of settling disputes not resolved by good-faith discussion.[1] The results of

---

[1] The Affiliation Agreement provides:

"The only means of settlement of disputes concerning the

2

any such arbitration would be final and binding on the parties.

In the arbitrator's words, "[d]isharmony between the two unions ensued almost immediately after the ink dried on the three contracts." Docket No. 97-1, p. 5. Most relevantly, NEMSA preserved a retainer agreement with Goyette & Associates (Goyette), a California law firm, without NAGE's knowledge. Until early May, 2012, NEMSA paid $45,000 monthly to Goyette; at that point, Colcord diverted those monthly fees to himself. Goyette subsequently filed a lawsuit for over $825,000 in missing fees and obtained a writ of attachment for $270,000. This attachment prevented NEMSA from fulfilling its fee obligations to NAGE, which was still unaware of the Goyette agreement or the subsequent lawsuit. NEMSA made only partial payments in December, 2012, and January, 2013; it made no payments at all in February and March 2013. Further controversy arose over the formula used to calculate NEMSA's payments to NAGE.

In late 2012, the President and Treasurer of NAGE spoke with NEMSA personnel about NAGE's concerns with NEMSA's financial condition. Both organizations discussed terminating Colcord and

---

> interpretation, application, and enforcement of the terms of this Agreement shall be . . . good faith discussions in which each party shall attempt to share all information it has concerning the issue . . . In the event that the dispute is not settled by good-faith discussions, either party may request mediation/arbitration." Docket No. 97-2, p. 7.

The Servicing Agreement is to the same effect.

instituting new leadership, but were advised by consulting attorneys that such a course of action would violate the Employment Agreement. NAGE informed NEMSA in February, 2013, that it planned to issue a notice of default in light of NEMSA's delinquent payments. Further discussions occurred throughout the next few months, but no resolution was reached. On April 5, 2013, NAGE sent a letter terminating all three agreements with NEMSA. NAGE subsequently began to raid NEMSA's membership and challenge NEMSA's representation of several national bargaining units. In April, 2013, NAGE filed suit against NEMSA and Colcord in this Court to recover damages for the alleged contract breaches, over NEMSA's objection that the arbitration provisions in the Agreements forbade such judicial action. At the Court's encouragement, the parties agreed to submit to arbitration pursuant to Section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185(a) (Section 301), and the proceeding was stayed pending the issuance of an award.

At arbitration, NEMSA raised a plethora of claims against NAGE, only one of which the arbitrator, Robert M. Hirsch, found meritorious.[2] NAGE, as it now concedes, had declined to arbitrate the underlying disputes and instead "ran to court" with its

---

[2] Specifically, NEMSA contested NAGE's alleged refusal to arbitrate, its failure to protect against raiding, disregard of NEMSA's autonomy, failure to engage in good faith discussions, failure to give reasonable notice before termination, post-termination raiding, and breach of certain servicing agreement obligations.

breach of contract claim. Docket No. 97-1, p. 10. Although NAGE argued that it merely sought interim judicial relief, the arbitrator concluded that NAGE had breached the arbitration provisions of the Agreements by virtue of its failure to arbitrate, and that NEMSA was entitled to consequential damages for its efforts to enforce those provisions.

In turn, NAGE sought a declaration that it was legally justified in terminating its three contracts with NEMSA, as well as damages against NEMSA and Colcord jointly and severally. The arbitrator granted both requests. He first concluded that, while the arbitration provisions in the Agreements served as a dispute resolution mechanism, they did not "bar either party from terminating the contracts where a material breach was committed by the other side." Docket No. 97-1, p. 14. NAGE was thus within its rights to cease performance upon NEMSA's failure to pay fees it indisputably owed. The arbitrator further found that NAGE was entitled to damages from NEMSA and Colcord in the amount of $281,380 based on their respective breaches of the Servicing and Affiliation Agreements. Colcord had breached by diverting funds from Goyette to himself, the arbitrator wrote, while NEMSA erred in subsequently defaulting on its payments to NAGE.

Since that point, neither NEMSA nor Colcord has made any of the required payments. NAGE, accordingly, sought confirmation of the arbitration award in this Court. NEMSA filed a motion to

vacate.

## III. DISCUSSION

**A. Timeliness of NEMSA's Motion to Vacate**

At the outset, NAGE urges the Court to dismiss NEMSA's motion to vacate the arbitration award on the ground that it was not timely filed. Both parties agree that Massachusetts is the forum state, but disagree on the appropriate state statute of limitations. NAGE, on the one hand, urges the Court to apply the thirty-day Massachusetts deadline governing motions to vacate arbitration awards set forth in M.G.L. c. 251, § 12[3], and contends that NEMSA's request, filed outside of that time frame, should fail on this basis alone. NEMSA looks instead to choice-of-law principles, which, it maintains, require the use of California's extended, 100-day deadline. Cal. Code Civ. Proc. § 1288.

The timeliness tussle is not surprising. "When Congress fails to furnish an express statute of limitations in connection with enforcement of a federal right, a court's initial look must be to state law to isolate the most closely analogous rule of timeliness." Posadas de Puerto Rico Assoc., Inc. v. Asociacion de Empleados de Casino de Puerto Rico, 873 F.2d 479, 480 (1st Cir. 1989) (applying Puerto Rico's thirty-day statute of limitations

---
[3] That provision states, in relevant part, that "[a]n application [to vacate] shall be made within thirty days after delivery of a copy of the award to the applicant."

6

for motions to vacate arbitration award in absence of deadline in Section 301 of LMRA); DelCostello v. Int'l Bhd. Of Teamsters, 462 U.S. 151, 158 (1983). In this situation, federal courts will apply the statute of limitations of the forum state's most analogous cause of action unless a federal limitations period "provides a closer analogy" and the federal policies at stake "render the federal rule more suitable." Communications Workers of America v. Western Electric Co., 860 F.2d 1137, 1139 (1st Cir. 1988) (quoting DelCostello, 462 U.S. at 172).

Once a court opts to borrow from state law, the selection of a limitations period is complicated if multiple states are connected to the dispute. The Supreme Court has expressly reserved the question whether federal or state conflict of laws principles should govern. UAW v. Hoosier Cardinal Corp., 383 U.S. 696, 705 n.8 (1966) (applying forum state deadline in Section 301 suit but noting that forum state was also state in which "all operative events occurred").

Most courts agree that, in selecting a choice of law rule to govern the quest for the most appropriate state limitations period for an underlying federal claim, the optimal approach is to fashion a federal choice of law rule. See Berger v. AXA Network LLC, 459 F.3d 804, 809-10 (7th Cir. 2006) (citing cases); see also Wang Labs., Inc. v. Kagan, 990 F.2d 1126, 1128 (9th Cir. 1993) (deciding "as a matter of federal law which state statute

of limitations is appropriate" for ERISA claim). Indeed, in the labor context, courts have generally held that federal choice of law principles should control, since "[t]he application of a state borrowing statute in a Section 301 case will comport with federal labor policy only coincidentally, if at all." Champion Int'l Corp. v. United Paperworkers Int'l Union, 779 F.2d 328, 333 (6th Cir. 1985).

Although the Supreme Court has not yet established a federal common law choice of law rule, courts to address the question have applied the forum state's limitations period absent good reason for departure. First, three circuit courts agree that the forum state's deadline should not control if it "would seriously frustrate federal . . . policy." Consol. Express, Inc. v. N.Y. Shipping Assoc., Inc., 602 F.2d 494, 507-08 (3d Cir. 1979), vacated on other grounds, Consol. Express, Inc. v. N.Y. Shipping Assoc., Inc., 448 U.S. 902 (1980); Champion, 779 F.2d at 334; Berger, 459 F.3d at 813. Furthermore, the Seventh Circuit has concluded that the forum's law should give way where "another state has more significant contacts with the dispute." Berger, 459 F.3d at 813; see also Restatement (Second) of Conflict of Laws § 142 cmt. e (1971) (statute of limitations to be drawn from state with "most significant relationship to the occurrence and the parties"). Finally, the Third and Sixth Circuits have rejected the forum state's deadline where it "work[s] severe

8

hardship to the litigants," Consol. Express, 602 F.3d at 507-08, or "create[s]. . . unfairness to the parties," Champion, 779 F.2d at 334.

To be sure, the First Circuit has ruled that the thirty-day deadline under Massachusetts law is not "anathematic to the federal [labor] policies at stake and the practicalities of litigation." Posadas, 873 F.2d at 486 (internal quotation omitted). But Posadas did not address those situations in which the forum state did not have the greatest connection to the dispute or where the forum deadline was unjust to the parties. Both of these concerns are present here, and together warrant use of the California deadline.

As NEMSA points out, the American Arbitration Association concluded that the proper location of the arbitration was California, and the matter was ultimately arbitrated by a California-based arbitrator. Moreover, at the time of the arbitration, NEMSA had lost four bargaining units to NAGE, three of which were located in California. The Affiliation and Servicing Agreements refer to California, not Massachusetts, and NEMSA is a California nonprofit labor organization.

Massachusetts's primary link to the dispute is the fact that NAGE is headquartered here. As the arbitrator ruled, though, NAGE improperly began this litigation in Massachusetts rather than following the arbitration provisions in the contract; NAGE now

9

attempts to cranberry-pick the more favorable Massachusetts limitations period primarily on this basis. To apply the thirty-day deadline would reward NAGE for its improper "gotcha!" conduct of picking a forum with the most restrictive time limit, although the state with the greater connection to the litigation is California. Accordingly, in these circumstances, NEMSA has presented compelling evidence that California has the closest connection to the case, and that the forum state's deadline would be unfair to the parties. NEMSA's motion to vacate the arbitration award was thus timely filed under California's 100-day deadline.

    B.    **NAGE's Motion to Confirm**

NEMSA contends that the arbitrator strayed too far from the language of the initial Agreements in crafting his award and that the final award was out of step with federal labor policy.

The standard for judicial review of arbitration awards pursuant to Section 301 of the LMRA is "one of the narrowest standards of judicial review in all of American jurisprudence." UMass Mem'l Med. Ctr., Inc. v. United Food & Commercial Workers Union, 527 F.3d 1, 4 (1st Cir. 2008) (quotation omitted). Even a belief that an arbitrator is patently wrong cannot justify a court's substitution of its own judgment for that of the arbitrator. See Cytyc Corp. v. DEKA Prods. Ltd. P'ship, 439 F.3d 27, 34 (1st Cir. 2006). Instead, "as long as an honest arbitrator

is even arguably construing or applying the contract and acting within the scope of his authority, the fact that a court is convinced he committed serious error does not suffice to overturn his decision." E. Assoc. Coal Corp. v. United Mine Workers of Am., Dist. 17, 531 U.S. 57, 62 (2000) (internal quotation omitted). Arbitration awards are thus "nearly impervious to judicial oversight." Teamsters Local Union No. 42 v. Supervalu, Inc., 212 F.3d 59, 61 (1st Cir. 2000).

As a result, the Court will only set aside an arbitration award if it cannot discern, within the four corners of the parties' initial agreement, any plausible basis for the arbitrator's interpretation. Coastal Oil of New Eng., Inc. v. Teamsters Local, 134 F.3d 466, 469 (1st Cir. 1998). Otherwise framed, an award must "draw[] its essence from the collective bargaining agreement" and not merely reflect the arbitrator's "own brand of industrial justice." Steelworkers v. Enter. Wheel & Car Corp., 363 U.S. 593, 596 (1960).

An arbitration award may also be vacated if it contravenes a public policy that is "explicit," "well defined," and "dominant." W.R. Grace & Co. v. Rubber Workers, 461 U.S. 757, 766 (1983). However, the Court's authority to vacate an award for this reason is narrow. The Court will only overturn an arbitration award on the basis of public policy after an "examination of whether the award created any explicit conflict with other laws and legal

11

precedents rather than an assessment of general considerations of supposed public interests." Prudential-Bache Sec., Inc. v. Tanner, 72 F.3d 234, 241 (1st Cir. 1995) (internal quotations omitted). Any violation of such a policy must then be "clearly shown." Misco, 484 U.S. at 43. Moreover, courts often reject such challenges. See, e.g., id. At 30-31 (arbitration award reinstating worker who had brought drugs onto employer property did not violate public policy); W.R. Grace, 461 U.S. at 766-67 (arbitration award granting damages to claimant under collective bargaining agreement, which conflicted with district court order, did not violate public policy requiring obedience to court order); Genzyme Corp. v. Fed. Ins. Co., 622 F.3d 63, 69-70 (1st Cir. 2010) (no public policy preventing securities litigation coverage in insurance policies where policy specifically mentioned such litigation). The policy in question must be "ascertained by reference to positive law and not from general considerations of supposed public interests." E. Assoc. Coal Corp., 531 U.S. at 62-63. The First Circuit has declined to vacate arbitration awards that "violate[] no specific provision of any law or regulation." Boston Med. Ctr. v. SEIU, Local 285, 260 F.3d 16, 25 (1st Cir. 2011).

The arbitrator agreed with NEMSA that "the arbitration provisions in the agreements served as a dispute resolution mechanism." On this basis, the arbitrator concluded that NAGE

12

breached the Agreements when it filed suit in federal court in lieu of submitting the dispute to mediation.[7] Docket No. 97-1, p. 14. However, the arbitrator further reasoned, the arbitration provisions did not

> bar either party from terminating the contracts where a material breach was committed by the other side. It is black letter law that a party is excused from its obligation to perform under a contract where the counter-party has committed a material breach of that contract.

Id.

NAGE maintains that the arbitration award "drew its essence" from the Agreements and, accordingly, that the Court is not now entitled to substitute its own judgment for that of the arbitrator. NEMSA, in turn, complains that the arbitrator failed even to interpret the Agreements in crafting his award, since his reliance on black-letter contract law was in tension with the arbitration provisions to which the parties had initially agreed.

In my view, the arbitrator's reading of the Agreements was not unreasonable. It cannot be said, as NEMSA would have it, that the arbitrator did not undertake to interpret the Agreements in good faith, or that he "ignored the plain language" of the arbitration provisions in the Agreements. Misco, 484 U.S. at 38. As the Supreme Court recently stated, arbitrators may consider ordinary contract law when construing labor agreements. M&G

---

[7] Indeed, he awarded consequential damages to NEMSA on this basis.

Polymers USA, LLC v. Tackett, No. 13-1010, slip op. at 6 (Jan. 26, 2015) ("We interpret collective-bargaining agreements . . . according to ordinary principles or contract law, at least when those principles are not inconsistent with federal labor policy."); Providence Journal Co. v. Providence Newspaper Guild, 271 F.3d 16, 20-21 (1st Cir. 2001) (affirming arbitrator's interpretation of labor agreement based on principles of contract law); N. Adams Reg. Hosp. v. Mass. Nurses Ass'n, 889 F. Supp. 507, 513-14 (D. Mass. 1995) (arbitrator "could properly resort to traditional rules of contract construction to clarify . . . ambiguity and determine the parties' intent"); see generally Elkouri & Elkouri, How Arbitration Works, Ch. 10.7 at 60-69 (7th ed. 2012) ("[A]rbitrators are expected to recognize the fundamental principles of contract law.").

NEMSA insists that the arbitrator's reliance on black-letter contract law contravened federal labor policy favoring the arbitration of labor disputes. The Agreements are governed by the principles set forth in Section 301 of the LMRA, NEMSA points out, which require the enforcement of arbitration provisions in labor contracts. See, e.g., United Steelworkers of America v. Warrior & Gulf Nav. Co., 363 U.S. 574, 577-78 (1960) ("[T]he policy to be applied in enforcing . . . [labor] arbitration was that reflected in our national labor law.").

NEMSA has not clearly shown that the arbitrator's award ran

14

counter to the federal policy in favor of labor awards. Indeed, the arbitrator expressly concluded that NAGE had breached the Agreements by filing suit in federal court rather than submitting to arbitration. "The claimant has established that NAGE breached its duty under the arbitration provisions of the Affiliation and Servicing Agreements," he noted, "and is entitled to consequential damages incurred by NEMSA to enforce those provisions." Docket No. 97-1, p. 11. Accordingly, the arbitrator rejected NAGE's position that it had no duty to arbitrate. Even if the better approach would have been to conclude that NAGE was required to arbitrate the question of material breach before it ceased performance under the contract, the arbitrator's decision to import common-law principles of contract did not violate the public policy in favor of arbitration.

### C. Attorneys' Fees

NAGE also seeks the attorneys' fees and costs incurred in responding to NEMSA's motion to vacate. Under federal common law, such an award is warranted in a Section 301 action where the losing party's position was "frivolous, unreasonable, or without foundation." Local 2322, Int'l Bhd. Of Elec. Workers v. Verizon New Eng., Inc., 464 F.3d 93, 100 (1st Cir. 2006) (quotation omitted). This standard is not met here.

### IV. ORDER

The plaintiff's motion to confirm the arbitration award (Docket No. 91) is **ALLOWED**. The defendant's motion to vacate (Docket No. 97) and the plaintiff's motion for attorneys' fees (Docket No. 100) are **DENIED**.

                                       /s/ Patti B. Saris
                                       Patti B. Saris
                                       Chief United States District Judge